STAMPEDE TOOL WAREHOUSE, INC., Plaintiff-Appellee, v. MARK MAY *et al.*, Defendants-Appellants.

First District (3rd Division)   No. 1—93—3725

Opinion filed March 22, 1995.—Rehearing denied June 13, 1995.—Modified opinion filed June 14, 1995.

Fioretti & Des Jardins, Ltd., of Chicago (Leonard A. Des Jardins and Robert W. Fioretti, of counsel), for appellants.

Welsh & Katz, Ltd., of Chicago (R. Mark Halligan, Kara F. Cenar, and John L. Ambrogi, of counsel), for appellee.

JUSTICE CERDA delivered the opinion of the court:

Defendants, Mark May and Fred Moshier, appeal permanent injunctions under the Illinois Trade Secrets Act (ITSA) (765 ILCS 1065/1 *et seq.* (West 1992)) restraining them from doing business with any customer of plaintiff, Stampede Tool Warehouse, Inc. (Stampede), to whom they had access during their employment at Stampede. On appeal, defendants assert that (1) the trial court erred when it found that plaintiff's customer list is protectable as a trade secret under the ITSA; and (2) the scope and time of the permanent injunctions are overbroad.

Defendants worked for Stampede from October 1990 until May 1991. On July 24, 1991, the trial court entered a temporary restraining order enjoining defendants from misappropriating Stampede's trade secret customer list. Court hearings on Stampede's request for a preliminary injunction began in August 1991. The following testimony was heard.

Richard Kuhn, president of Stampede, testified that Stampede is a national distributor of automotive tools and equipment. Stampede buys tools and equipment from manufacturers, then sells them to

automotive jobbers, which include service stations, tool dealers, and automotive stores. The jobbers then sell the tools to the end users, who are mechanics and homeowners.

There are over 20,000 independent jobbers nationwide. Of Stampede's 11,000 customers, 35% to 40% are currently buying from it. Stampede's customer list has been developed from prospecting, which is calling end users and asking them the name of their tool jobber. Kuhn stated that there is no available public source or book where automotive jobbers are listed. Kuhn testified that the cost of getting new customers is $50,000 per month, which includes salaries, phone bills, and overhead. Stampede's salesmen spend about 60 hours per month prospecting to find about 100 new customers, half of whom actually buy from Stampede. In addition to telephone solicitation, Stampede sends out 11,000 to 12,000 catalogues each quarter. The names for the catalogue list were gathered from years of prospecting and word of mouth.

Once a new customer is found, the information is kept confidential. The names are entered into a computer, which is accessed by a code that only Kuhn and Frank Penzo, Stampede's general manager, know. The hard copies are placed in a locked office, for which only Kuhn and Penzo have keys, or in Kuhn's basement at home. In addition, Kuhn checks the garbage every day. Stampede's salesmen work in confined areas and are not allowed to take their customer cards from the telemarketing room. At the end of the shift, their three-ring binders and customer cards are locked up.

Although the salesmen do not sign restrictive covenants, Stampede's job application states that all information received on the job is confidential and remains Stampede's property. When Kuhn noticed a large number of unauthorized photocopies being made after hours in April 1991, he installed security cameras. The cameras never filmed defendants taking any lists or other data from the office and stopped working after three or four days.

After Moshier quit, he told Kuhn that he was setting up a company to broker out telemarketing services to warehouses. He said that he already had over 400 customers. Moshier suggested that Kuhn become one of the warehouses for which he would telemarket. Shortly after Kuhn agreed to do business with Moshier, he received three orders from Moshier via fax. Following an investigation, Kuhn determined that all three orders came from Stampede customers. Two of the customers were longstanding customers and the third was a new customer whom Moshier had found in January 1991 while working at Stampede. In the two years after defendants left Stampede, the company experienced a drop of $1 million in sales.

Emile Marchand, a Stampede salesman, testified that he was hired at the same time as defendants. At that time, the names of current customers were supplied by Kuhn and prospective customers were developed through prospecting. Marchand went to the library and copied down names of service stations out of telephone books from around the country. In addition to getting the names of jobbers from end users, Marchand also got them from sales catalogues, telephone books, and car dealership catalogues. When a new customer was found through prospecting, Kuhn placed that information on Stampede's computer. The salesmen were not allowed to take the customer lists from the office. They were either left on the salesmen's desks or locked in Kuhn's steel cabinet at the end of the day. According to Marchand, Stampede's customers turn over every three to five years.

On May 5, 1991, Marchand, defendants, and three former Stampede salesmen met at Fox's Pub to discuss leaving Stampede and going to work for Micor, a competitor. At that meeting, Moshier stated that he would leave Stampede, but needed more time to get the rest of his customers' names and telephone numbers. Following the meeting, Marchand saw the list Moshier was compiling, which numbered 60 to 80 names, and a list that one of May's customers had sent him. Marchand also heard May state that he had his customers' names and telephone numbers.

Next, Mark May testified that he began working at Stampede on October 22, 1990. During his orientation, May reviewed and signed the employment application. He considered the statement about the confidentiality of customers a standard part of any application. When May started working at Stampede, the three-ring binders containing the customer cards were not locked up, but had to remain in the telemarketing room. Some time later, the binders were locked up at night. May stated that he had limited access to the computers and that Kuhn did not mention confidentiality in any sales meetings.

May explained that he got new customers by getting the names of service stations and tool dealers from telephone books in the library and from referrals by other tool dealers. As time went on, May contacted auto parts stores rather than tool dealers.

May denied discussing the customer lists at Fox's Pub in May 1991 and denied taking any names or addresses of customers when he left Stampede. He testified that he did not take his binders or any computer disks nor did he write down the names, addresses, or telephone numbers of any of his customers.

After resigning from Stampede on May 20, 1991, May became an independent contractor with Micor, where he contacted some of the

same customers he had while at Stampede. After remembering their names and locations, May obtained their telephone numbers from directory assistance or telephone books. May explained that he remembered many of his customers because he worked with them over a period of time. When defense counsel named 11 different customers, May described them, their work, their locations, and sometimes how he obtained their telephone number. May said that some of the jobbers reminded him to call others. Of the 500 customers he had at Stampede, he contacted 50, none of whom he knew before working at Stampede.

After leaving Micor a month later, May contacted two or three customers he had serviced while employed by Stampede. At that time, May believed that he had authorization to sell tools for Stampede pursuant to Moshier's agreement with Kuhn. May faxed an order to Stampede, which filled the order. He expected to get a 5% commission from the orders he faxed to Stampede after he left, but he never received any payment.

May stopped selling tools on July 24, 1991, when the temporary restraining order was entered. He was aware, however, that Moshier continued to sell to tool jobbers under the name of "Teletool" or "Tool Plus." Although May had placed an order through Moshier for equipment for his own personal use, he denied having any tool-related business.

Frederick Peter Weber, president and owner of Wholesale Tools Company, a Stampede competitor, testified that there are about 125 major manufacturers of automotive tools and equipment in the country and about 30 major and 40 minor wholesalers. According to Weber, he constantly updates his customer list because 10% of the jobbers leave the industry every year and jobbers purchase tools from more than one warehouse.

Next, Salvatore Prestigiacomo testified that he left Stampede over a pay dispute. Prestigiacomo stated that those present at the Fox's Pub meeting in May 1991 had discussed starting a telemarketing operation at Micor. After leaving Stampede, Prestigiacomo asked Moshier if he had gotten names from Stampede. In response, Moshier produced an address book that contained about 100 names, two of which Prestigiacomo recognized as Stampede customers. Prestigiacomo stated that he never saw May with any names.

Defendant Moshier testified that the confidentiality agreement he signed when he was hired in October 1990 meant that he could not take anything out of the office, not that he could not stay in the business and contact the same customers. When he began working at Stampede, Kuhn gave Moshier the names of 100 to 150 current

customers to call. New customers were found through prospecting. He went to the library on his own time and copied the names of service stations out of telephone books from around the country. He then called the stations to get the names of their tool jobbers. He also got referrals from other jobbers.

According to Moshier, the salesmen were not required to leave their prospect lists in the office. Only the binders containing customer cards, which included specific information, were locked in the file cabinet. Moshier testified that there were daily sales meetings during which salesmen were told not to touch the computer and not to take their binders home.

Moshier admitted that there had been a discussion at Fox's Pub on May 5, 1991, about leaving Stampede and working for Micor. He denied, however, saying that he needed two more weeks to write down the names and telephone numbers of his customers. Moshier further denied taking any binders or computer printouts from the office. He took only his prospecting sheets, which were generated at the library on his own time. Moshier denied writing down, or leaving with, any names or addresses of his Stampede customers. Moshier did admit, however, that he had an address book that included the names of friends, relatives, and a few jobbers.

On May 21, 1991, Moshier began working at Micor, where he telemarketed to some of his Stampede customers. Moshier reconstructed his customer list by looking at a map and remembering his former customers time zone by time zone. He then got their telephone numbers from directory assistance or other customers. According to Moshier, tool dealers buy from five or six different warehouses.

Moshier left Micor on July 12, 1991, when he started his own business called Tele-Tool Network, which was a telemarketing business. Moshier tried to work out a deal with Kuhn, but that failed. In his business, Moshier solicited some of his Stampede customers. Moshier denied that May ever worked for him at Tele-Tool Network, which continued after the temporary restraining order was entered on July 24, 1991, until December 1991.

On October 14, 1993, the trial court granted permanent injunctions against Moshier and May, finding that Stampede's customer list is a trade secret under the ITSA and that defendants deliberately memorized and misappropriated Stampede's customer list in violation of the ITSA. The trial court enjoined and restrained defendants "from engaging, directly or indirectly, in any of the following acts: (a) soliciting or accepting any orders for the sale of automotive tools and equipment from any of the Stampede customer accounts that [defendants] had access to while employed at Stampede Tool

Warehouse, Inc.; (b) selling any automotive tools and equipment to any of the Stampede customer accounts that [defendants] had access to while employed at Stampede Tool Warehouse, Inc.; and (c) receiving any commissions or other monies for the sale of automotive tools and equipment from any of the Stampede customer accounts that [defendants] had access to while employed at Stampede Tool Warehouse, Inc."

In its oral findings, the trial court stated that May misappropriated the names and addresses by memorizing them and that Moshier misappropriated the names and addresses by either writing that information down or by memorization. The trial court also stated, however, that it was not making a finding that the names and addresses were physically taken by defendants.

For the reasons that follow, we affirm in part and reverse and modify in part.

The first issue on appeal is whether Stampede's customer list is a protectable trade secret under the ITSA, which was enacted in 1988. The ITSA states in pertinent part:

"[T]his Act is intended to displace conflicting tort, restitutionary, unfair competition, and other laws of this State providing civil remedies for misappropriation of a trade secret." 765 ILCS 1065/8(a) (West 1992) (formerly Ill. Rev. Stat. 1991, ch. 140, par. 358(a)).

Defendants' pre-1988 cases that involve restrictive covenants, including those cases that discuss a near-permanent relationship between the parties, are inapplicable to this case, which does not involve a restrictive covenant.

Under the ITSA, a trade secret includes the following:

"(d) *** list of actual or potential customers or suppliers, that:

(1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and

(2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality." 765 ILCS 1065/2 (West 1992) (formerly Ill. Rev. Stat. 1991, ch. 140, par. 352).

Defendants assert that the customer list is not protectable under the ITSA because it can be duplicated by anyone willing to solicit end users from the telephone book or other directories in order to get the names of their tool suppliers. To support that position, defendants rely on *Hamer Holding Group, Inc. v. Elmore* (1990), 202 Ill. App. 3d 994, 1012, 560 N.E.2d 907, which is factually dissimilar. That customer list was not a trade secret because anyone having access to

the Secretary of State's information and a telephone book could have easily duplicated the client list (*Hamer Holding Group, Inc.*, 202 Ill. App. 3d at 1011), whereas in this case, there is no one source in which to find jobbers.

Defendants also rely on *Colson Co. v. Wittel* (1991), 210 Ill. App. 3d 1030, 569 N.E.2d 1082, where the court held that the customer list was not a trade secret because the statute requires that the information be kept secret from the person accused of misappropriation of the trade secret. In *Elmer Miller, Inc. v. Landis* (1993), 253 Ill. App. 3d 129, 134, 625 N.E.2d 538, the fourth division of the first district did not follow that part of the *Colson* decision, and we are in agreement.

In response, Stampede asserts that its customer list is a protectable trade secret because it is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use. Stampede contends that it has a niche market that sells tools and equipment to mobile tool jobbers. To locate a tool jobber and develop a relationship requires a substantial amount of time, effort, and money because its list of tool jobbers is not readily available from a telephone book, library, special directories, or any other publicly available sources, which can be used only to canvas end users.

Furthermore, Stampede asserts that it protects its customer list using reasonable efforts to maintain its secrecy and confidentiality. Stampede explains that its offices are locked, garbage is checked daily, special computer access codes are used, customer information is limited to persons on a need-to-know basis, hard copies of customer lists are kept only in Kuhn's basement at home, salesmen's call books are kept locked up and cannot be removed from the office, security cameras are used, employee confidentiality agreements are entered into, and there are constant reminders about the confidentiality of the lists.

Stampede also maintains that defendants knew that Stampede's customer list was confidential when they were hired. They both signed employment applications, in which they agreed not to disclose, use, or make available to others to use the customers and sources of supply, which were confidential and proprietary to Stampede.

To support its position, Stampede relies on *Gillis Associated Industries, Inc. v. Cari-All, Inc.* (1990), 206 Ill. App. 3d 184, 193-94, 564 N.E.2d 881, and *Elmer Miller, Inc.* (253 Ill. App. 3d at 134-35).

Although the customer list in *Gillis* was not a trade secret

because the plaintiff did not keep it reasonably secret and confidential, the court concluded that the list would have economic value to both the plaintiff and its competitors. (*Gillis Associated Industries, Inc.*, 206 Ill. App. 3d at 190-92.) The list, which consisted of over 3,000 names and telephone numbers of customers, could not be constructed from one source, but could only be produced after significant time, effort, and expense. *Gillis Associated Industries, Inc.*, 206 Ill. App. 3d at 190-91.

In *Elmer Miller, Inc.*, the permanent injunction prohibiting the defendants from soliciting any of plaintiff's customers was affirmed because the 1,200 customer files were confidential, only the salesmen who contacted repeat customers had access to them, and they included information that was unique to each customer so that orders could be filled over the telephone. *Elmer Miller, Inc.*, 253 Ill. App. 3d at 134-35.

In determining whether information is a trade secret, the focus of both the common law and the ITSA is on the secrecy of the information sought to be protected. (*Hamer Holding Group, Inc.*, 202 Ill. App. 3d at 1011.) The key to secrecy is the ease with which information can be readily duplicated without involving considerable time, effort or expense. *Hamer Holding Group, Inc.*, 202 Ill. App. 3d at 1011.

Under the ITSA, there are two requirements to consider: (1) whether the customer list is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and (2) whether the customer list is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality. 765 ILCS 1065/2 (West 1992) (formerly Ill. Rev. Stat. 1991, ch. 140, par. 352).

Section 2(d)(2) of the ITSA is similar to the common law factors used in determining whether information is a trade secret, which include: (1) the extent to which the information is known outside the employer's business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and his or her competitors; (5) the amount of effort or money expended by the employer in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *ILG Industries, Inc. v. Scott* (1971), 49 Ill. 2d 88, 93, 273 N.E.2d 393; *Colson Co.*, 210 Ill. App. 3d at 1036, 569 N.E.2d at 1085.

Although an employee's general knowledge is not a trade secret

(*ILG Industries, Inc.*, 49 Ill. 2d at 93-94; *Smith Oil Corp. v. Viking Chemical Co.* (1984), 127 Ill. App. 3d 423, 427, 468 N.E.2d 797; *Packard Instrument Co. v. Reich* (1980), 89 Ill. App. 3d 908, 917, 412 N.E.2d 617), the general knowledge in this case is the method defendants used in finding prospective customers, not the actual customer information. When the information learned is confidential, as here, it can be a trade secret. *Schulenburg v. Signatrol, Inc.* (1965), 33 Ill. 2d 379, 387, 212 N.E.2d 865.

●1 In this case, the record shows that the customer list is a trade secret. The customer list has been developed through the laborious method of prospecting, which requires a substantial amount of time, effort, and expense by Stampede. A list of jobbers is not readily available from any one public source. Instead, the salesmen obtain a list of end users through telephone books, catalogues, and other publicly available sources, and then contact those people to get the names of jobbers, who are the potential customers. The salesmen then develop a relationship with those potential customers.

In addition, Stampede protects its customer list using reasonable efforts to maintain its secrecy and confidentiality. Its offices are locked, garbage is checked daily, special computer access codes are used, customer information is limited to persons on a need-to-know basis, hard copies of customer lists are kept locked in the office or in Kuhn's basement at home, salesmen's call books and customer cards are kept locked up and cannot be removed from the office, and security cameras are used. Moreover, both defendants signed employee confidentiality agreements that stated that the names of Stampede's customers could not be used or disclosed because they belonged to Stampede and were confidential. As a result, we conclude that Stampede's customer list is a trade secret that is protectable under the ITSA.

We must now consider whether defendants misappropriated the trade secret. The ITSA provides:

"(b) 'Misappropriation' means:
\*\*\*
(2) disclosure or use of a trade secret of a person without express or implied consent by another person who:
\*\*\*
(B) at the time of disclosure or use, knew or had reason to know that knowledge of the trade secret was:
\*\*\*
(II) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use." 765 ILCS 1065/2 (West 1992) (formerly Ill. Rev. Stat. 1991, ch. 140, par. 352).

Defendants assert that Stampede's customer list is not protectable because there was no physical taking of the list, but instead was committed to memory. Defendants contend that any general knowledge or information that they took with them when they left Stampede was not a misappropriation.

In response, Stampede asserts that actual misappropriation of the trade secret information was established because they intentionally copied or memorized the customer list. Stampede argues that the ITSA does not require a plaintiff to prove actual theft or conversion of physical documents embodying the trade secret information. We agree.

Although an employee may take general knowledge or information he or she has developed during their employment (*Lee/ O'Keefe Insurance Agency, Inc. v. Ferega* (1987), 163 Ill. App. 3d 997, 1004-05, 516 N.E.2d 1313; *Smith Oil Corp.*, 127 Ill. App. 3d at 428; *Packard Instrument Co.*, 89 Ill. App. 3d at 917), he or she may not take any confidential information, including trade secrets. (*Schulenburg*, 33 Ill. 2d at 387.) That taking does not have to be a physical taking by actually copying the names. A trade secret can be misappropriated by physical copying or by memorization. *Schulenburg*, 33 Ill. 2d at 387; *Televation Telecommunication Systems, Inc. v. Saindon* (1988), 169 Ill. App. 3d 8, 14, 522 N.E.2d 1359.

■ There was substantial evidence that defendants misappropriated the customer list either through copying down names or through memorization. In fact, defendants admitted that they redeveloped their customer lists by remembering the names and locations of at least some of their Stampede customers. Using memorization to rebuild a trade secret does not transform that trade secret from confidential information into nonconfidential information. The memorization is one method of misappropriation. Since the trial court's findings were not against the manifest weight of the evidence, we affirm the injunctions. *Smith Oil Corp.*, 127 Ill. App. 3d at 429.

Finally, we must consider whether the scope of the permanent injunctions is too broad. There are conflicting social and economic policy considerations in every trade secret case. (*ILG Industries, Inc.*, 49 Ill. 2d at 93.) On one hand, a business that has expended substantial amounts of money and time to develop secret advantages over its competitors must be protected against the misappropriation of that information by a prior employee, who was in a position of confidence and trust. On the other hand, it is a fundamental right of an individual to pursue the particular occupation for which he or she is best trained. (*ILG Industries, Inc.*, 49 Ill. 2d at 93.) Injunctive relief should not go beyond the need to protect the legitimate interests of

the plaintiff and should not unduly burden the defendant. *Elmer Miller, Inc.*, 253 Ill. App. 3d at 135.

Defendants assert that the permanent injunctions are too broad in scope and time to protect Stampede's interests and unnecessarily restrains the livelihood of defendants. Defendants rely on *ILG Industries, Inc.* (49 Ill. 2d at 97-98), where the court restricted the injunction to 18 months, which was the time that the trade secret could have been reproduced using reverse engineering. That court stated that commercial morality is preserved by preventing one from wrongfully using secret information for a period of time no longer than that required to discover or reproduce that information by lawful means. *ILG Industries, Inc.*, 49 Ill. 2d at 97-98.

Defendants also cite *Schulenburg* (33 Ill. 2d at 388), which held that an injunction should be limited in duration to the period of time reasonably required for defendants to legally reproduce the trade secret.

In response, Stampede asserts that the injunction was not overbroad because it expressly limited the scope of the permanent injunctions to a special list of tool jobbers that defendants were assigned while employed at Stampede. In support of that position, Stampede cites *Elmer Miller, Inc.* (253 Ill. App. 3d at 135), where the court found that the preliminary injunction was not overbroad.

■ After considering the public policy and the evidence, we hold that the permanent injunctions are overbroad in their duration, but not in their scope. The injunctions are not overbroad in that they expressly limit their scope to a list of tool jobbers that defendants were assigned while employed at Stampede. However, the list of 1,500 names should be divided into two separate lists that include only the customers to which each defendant had access. The injunctions are overbroad in their duration since the average jobber remains in the industry from three to five years and purchases tools from more than one warehouse, and defendants could develop their own customer list from scratch by using the methods they learned at Stampede.

As a result, we reverse the permanent injunctions and modify them to last four years from July 21, 1991, when the original temporary restraining order was entered. We remand the cause with directions to the circuit court to compile separate customer lists for each defendant.

Based on the foregoing, we affirm the circuit court's findings that Stampede's customer list is a trade secret that was misappropriated by defendants. However, we reverse the circuit court's granting of permanent injunctions and modify the injunctions so that their dura-

tion is for four years beginning on July 24, 1991. In addition, we remand this cause with instructions to the circuit court to compile separate customer lists for each defendant.

Affirmed in part; reversed and modified in part; remanded in part.

GREIMAN, P.J., and TULLY, J., concur.