SYSTEM DEVELOPMENT SERVICES, INC., Plaintiff-Appellee, v. TIMOTHY F. HAARMANN et al., Defendants-Appellants.

Fifth District   No. 5—07—0648

Opinion filed April 13, 2009.

Elliot Wiczer and Bernard Wiczer, both of Wiczer, Wiczer & Zelmar, LLC, of Northbrook, and Roy Jackson Dent, of Brankey & Smith, P.C., of Charleston, for appellants.

Christopher A. Koester, of Taylor Law Offices, P.C., of Effingham, for appellee.

JUSTICE STEWART delivered the opinion of the court:

The defendants appeal from the judgment of the circuit court of Effingham County, Illinois, that granted the plaintiff an injunction and awarded the plaintiff damages pursuant to the Illinois Trade Secrets Act (Trade Secrets Act) (765 ILCS 1065/1 *et seq.* (West 2006)). We reverse.

The plaintiff, System Development Services, Inc. (SDS), is an Illinois corporation in the business of furnishing computer network services to businesses in and around Effingham County, Illinois. The defendants, Timothy F. Haarmann, Jason B. Repking, Rick Hoene, and Terry Oldham, are computer technicians that were formerly employed with SDS. Haarmann left employment at SDS in January of 2004, and Repking, Hoene, and Oldham left SDS on April 9, 2004. The defendants then began doing business under the name Technical Partners, and they began competing with SDS in providing the businesses in Effingham County with computer network services.

On May 21, 2004, SDS filed a multicount complaint seeking injunctive relief and damages against the defendants, alleging that the defendants violated the Trade Secrets Act by misappropriating, disclosing, using, and acquiring its customer list, manuals, marketing plans, profitability analysis, pricing plans and determinations, and knowledge of SDS's customers' computer systems and system requirements. The plaintiff filed a motion for an emergency restraining order, seeking to prohibit the defendants from having any contact with SDS's customers for a period of two years. On June 22, 2004, the circuit court denied the motion for an emergency temporary restraining order. On November 9, 2004, the plaintiff filed an amended complaint. Counts I through IV of the amended complaint alleged that the defendants violated the Trade Secrets Act, and counts V through VII alleged that the defendants violated fiduciary duties they owed to SDS.

On May 8, 2006, through May 11, 2006, the circuit court conducted a bench trial on SDS's amended complaint, and on February 23, 2007, the circuit court entered a memorandum of decision. The court found that SDS's customer list and information about its customers' computer systems and networks were protectable trade secrets under the Trade Secrets Act. The court found that the defendants "utilized SDS's customer mailing list and that it was improperly obtained" and that the defendants "not only utilized their general skills and knowledge of the industry in their new business, they also utilized technical and confidential information that was particularized to each individual customer of SDS that included the intricacies of each customer's network." The court held that SDS was "entitled to compensation for harm caused by defendants' improper conduct and a cessation of the conduct continuing." The court found, however, that the defendants did not "misappropriate SDS'[s] job budgets, estimates[,] and pricing strategies, SDS's weaknesses \*\*\*, nor [sic] SDS's internal marketing information."

The court granted an injunction prohibiting the defendants "from marketing to and from providing any computer or network[-]related

type services to all actual and potential customers in SDS'[s] customer database on and prior to April 9, 2004, for a period of three (3) years commencing immediately upon [the] entry of this Judgment." In addition, the court granted an injunction prohibiting the defendants from disclosing any of SDS's trade secrets. The court awarded SDS a judgment in the amount of $481,892 plus court costs, attorney fees and expenses in the total amount of $260,695.99, and exemplary damages in the amount of $20,000. The judgment for the plaintiff was entered on October 29, 2007, and the defendants filed a timely notice of appeal.

The evidence presented at the bench trial established that SDS began operating in 1983, when its founder, Steven G. Schallert, began helping another company "write some software application." SDS started providing custom applications and software for other customers as well. Initially, Schallert was SDS's only employee, and he ran the business as a sole proprietorship out of his home in Effingham, Illinois. At the same time, he also worked full-time as the director of information systems at a hospital in Mattoon, Illinois. In 1995 or 1996, Schallert incorporated SDS and started working full-time for the corporation. He operated SDS as a "full-time consulting service." He continued to work out of his living room, hired an additional employee, and targeted local businesses in Effingham, for its products and services. At some point, Schallert moved SDS's operations to an apartment building he owned.

In the fall of 1997, SDS hired Haarmann as a computer programmer. In negotiating Haarmann's employment, Schallert sent Haarmann an offer of employment dated September 28, 1997. The offer of employment contained a paragraph addressing the issue of confidentiality, which stated: "The nature of the type of work done for many of our customers requires a high level of confidentiality. It is understood failure to maintain strict confidentiality of System Development Services work[-]related information for both customers and company are [sic] grounds for severe disciplinary action, including possible termination."

In 1998, SDS moved from Schallert's apartment building to the Lincoln Land Building in Effingham. The building was a "professional office environment" with locked doors and a security alarm. Schallert explained that all of SDS's client information was stored on its computer "server equipment" that was protected by a network "firewall." The firewall prevented public access to SDS's computer network through the Internet. Each computer in SDS's network and SDS's e-mail server were protected with passwords. Schallert testified that they also used paper shredders to shred confidential documents prior to placing them into the trash.

In 2001, SDS's business started moving away from custom software applications and started focusing on computer networking services for its business customers. SDS added administrative staff, more programmers, and "networking services people." Schallert explained that the networking services related more to the hardware and equipment of the customers, rather than the programming. He testified that in order to provide network services, a computer technician had to become "intimately knowledgeable of customers' networks, computer systems, and applications." When a customer called SDS for its services, it would send one of its technicians to the customer's location to learn about the customer's computer network needs.

Schallert testified SDS purchased an "ACT software" for marketing purposes and for maintaining a database of addresses and contact information for customers and potential customers. The ACT software was password-protected. SDS's network included an automated program that copied the customer information in the ACT database into SDS's e-mail database so that the information in each database was the same. The e-mail database was also password-protected, but all of SDS's employees had access to it. The customer list included current customers, past customers, potential customers, vendors, and various people in the computer business. This ACT database and the identical e-mail database constituted the "client list" that SDS asserted was entitled to protection under the Trade Secrets Act.

Schallert testified that in 2002, SDS began "growing fairly rapidly." On July 5, 2002, SDS entered into an agreement for the purchase of the computer division of one of its competitors, RTA Systems. The agreement provided that SDS would purchase all of RTA Systems' "customers, assets, inventory[,] and intellectual property related to the computer division." The agreement provided that, in exchange, Doug Collins would receive a 35% ownership in SDS, and RTA Systems agreed to not "operate, directly or indirectly, a similar computer services company within 30 miles of Effingham, Illinois[,] for 2 years."

Schallert and Collins valued the transaction at $1 million, but no cash was transferred in the transaction. The purchase of RTA Systems' computer division was funded entirely with the SDS stock transferred to Collins. Schallert and Collins determined that the value of RTA Systems' assets and inventory was $200,000 and that the value of the intellectual property was $800,000. Collins testified that they arrived at $800,000 for the intellectual property by averaging the last two years of sales by RTA Systems' computer division. The agreement stated, "There is zero value associated with customer good will."

After the purchase, SDS integrated RTA Systems' customer list

into SDS's customer list in SDS's ACT database and e-mail database. None of RTA Systems' customers were contractually obligated to continue to do business with SDS after the transaction. According to Collins, RTA Systems had approximately 200 clients located in Effingham County in its database when SDS purchased the computer division, but only 50 or 55 of the clients were active at the time of the purchase.

Hoene and Repking were computer technicians who worked for RTA Systems at the time of the SDS purchase, and they joined SDS after the purchase. As a condition of employment, SDS required Hoene and Repking to sign an employee-confidentiality agreement, which stated as follows:

> "The employee acknowledges that his/her employment affords access to both company[-] and customer-related information that is proprietary, confidential, and not generally known by the public, current or prospective customers, vendors, subcontractors[,] or competitors. The employee agrees not to divulge any of this information to the general public, current or prospective customers, vendors, subcontractors[,] or competitors for any reason. Specific examples of confidential information would include[ ] but is not limited to: system manuals, employee manuals, price lists, pricing strategies, contracts, accounting/financial information (such as profit and loss statements, bank statements, balance sheets, job budgets, job estimates, job cost reports, etc.), management forms, customer lists[,] and internal marketing information. Violations of this confidentiality agreement can result in disciplinary action and/or dismissal."

Haarmann also signed the same employee-confidentiality agreement in July of 2002. SDS's employee handbook also contained a paragraph on confidentiality, which read as follows:

> "It is very important for all employees to maintain the confidentiality of our customer information as well as the confidentiality of company[-]related information. Information we have access to at our customer locations may seem non[ ]confidential but could be of great importance to them. We must maintain very high levels of confidentiality so our customers will know we can be trusted with their information. Company[-]related information is also very sensitive and should never be divulged or discussed with persons outside the company. Failure to maintain confidentiality is grounds for disciplinary action and possibly termination."

On December 11, 2002, SDS hired Oldham as a network analyst. On that date, he signed an offer of employment that included the following provision on confidentiality: "The nature of the type of work done for many of our customers requires a high level of confidentiality.

It is understood failure to maintain strict confidentiality of SDS work[-]related information for both customers and company are [*sic*] grounds for severe disciplinary action, including possible termination." The record does not contain a separate employee-confidentiality agreement signed by Oldham like the agreements signed by Haarmann, Hoene, and Repking. Schallert testified that the company's practice was to have all the employees sign an employee-confidentiality agreement, and he had no reason to believe that Oldham had not signed one, but he was unable to find one signed by Oldham in SDS's records. Oldham did not remember signing such an agreement.

Despite SDS's growth in 2002, SDS had a bad year financially in 2003. The company did not make a profit, and it did not give its employees any year-end bonuses. The morale of certain employees at SDS, including the defendants, began to decline. These employees would talk about their unhappiness at SDS from time to time when they gathered for lunch or after work. They complained about an increase in the company's overhead and an increase in their work hours.

In January of 2004, Haarmann resigned from SDS and formed his own business called Computer Guys. Haarmann's new business focused on "home-based" work rather than the "business-based" work that was SDS's focus. Haarmann saw Hoene, Repking, and Oldham on a few occasions after he left SDS, and he invited them to join his new business. They started considering the idea of leaving SDS and forming their own company. On Friday, April 9, 2004, Hoene, Repking, and Oldham resigned from SDS in order to join Haarmann in a new business called Technical Partners and to compete in the business of providing computer networking services to the businesses of Effingham County. None of the defendants had signed an agreement not to compete that would have prohibited them from competing against SDS upon the termination of their employment with SDS.

Schallert and Collins were concerned about the defendants forming a competing business because the defendants had a "great deal of knowledge about [SDS's] customers, their networks, their systems, their passwords." SDS sent letters out to all of its customers and active clients to notify them of the defendants' sudden departure and the unknown nature of their plans and requesting the customers to continue using SDS's services. According to Schallert and Collins, they also discovered that some work orders and e-mails had been deleted from SDS's computer system before Hoene, Repking, and Oldham left the company.

The next day, Saturday, April 10, 2004, Schallert found a Technical Partners flyer inside one of SDS's service vans that had been used

by Hoene. The flyer referred to Technical Partners as doing business in Effingham by providing technical computer networking services. The flyer announced that Hoene, Repking, and Oldham were new partners and were new computer technicians of Technical Partners. The brochure stated that Technical Partners could provide "better service rates along with the high quality service that you have come to expect." The defendants testified that Hoene, Repking, and Oldham helped Haarmann create the brochure three or four days before they resigned from SDS.

Hoene and Repking testified that after they resigned from SDS, they began preparing a mailing list of potential customers for their new business. They testified that they spent five or six hours preparing a handwritten mailing list by going through telephone books and using the Internet. The defendants denied using SDS's customer list to prepare their brochure mailing. The defendants mailed their brochure on Monday, April 12, 2004, and Hoene testified that he threw away the handwritten mailing list after the brochures were mailed. Oldham testified that on April 12, 2004, their strategy was to get their name out to potential customers in whatever way they could, including cold calls, the brochure mailing, and talking to people. He testified that they referred to the Internet, telephone directories, and a chamber of commerce directory. Each partner contributed names of businesses and people to contact in the Effingham area.

Several of SDS's customers gave Schallert copies of the brochures and envelopes Technical Partners had mailed to them. Schallert compared the addresses on the envelopes with the addresses contained in SDS's customer database. At the trial Schallert identified four envelopes that he believed contained distinguishing similarities with SDS's customer list. The similarities included the use of the four-digit zip code extension on one envelope, the use of post office box numbers on three of the envelopes, and particular address abbreviations used on all four envelopes. Schallert maintained that these distinguishing characteristics were not in the telephone book and indicated that the defendants had misappropriated SDS's client list. Schallert also presented evidence that from April 19, 2004, through May 18, 2004, Technical Partners' first 30 days of business, most of Technical Partners' income came from customers that had recently been SDS's customers. Schallert admitted that he did not have personal knowledge that the defendants actually printed or copied SDS's database, and the defendants denied taking any information from SDS's ACT database or e-mail database or otherwise utilizing SDS's customer list after they had resigned from SDS.

Schallert testified that he did not obtain any potential customers

by simply looking in the telephone book. He obtained the names of potential customers by attending business networking events, such as local Rotary Club and chamber of commerce events. He testified that SDS's customer list represented 20 years of effort and work. However, one of SDS's former office and sales managers testified that he identified potential customers for SDS by utilizing the telephone book and the chamber of commerce list of area businesses, by making cold calls, and by driving around Effingham. The sales manager testified that if there was an operating business in the area with more than five employees, it was a worthwhile target. The bigger the business, the more likely it would utilize computers and a computer network.

Collins testified that knowing that a particular business has a computer network and knowing a contact person's name makes it easier to get "your foot in the door." Knowing the customer's network is a further advantage. Collins also acknowledged, however, that identifying potential customers was somewhat based on common sense. Businesses with more than one employee were potential customers of computer networking services. Haarmann testified that when he left SDS in January of 2004, he told Schallert that all the businesses in the area were "fair game" since "probably 99 percent of the businesses in Effingham County have a computer now." According to Oldham, every business in the telephone book was a potential client, and all the computer businesses in Effingham were "going after the same piece of pie."

Oldham testified that Hoene's family members had many businesses in Effingham County and were well known within the Effingham community. Oldham testified that Repking also had a large family that worked in many businesses in the community. Hoene and Repking testified that they had lived in Effingham County their entire lives and that they had developed significant contacts throughout the business community through family, friendships, classmates, and personal contacts. They testified that their initial strategy after resigning from SDS was to contact businesses in Effingham County that they had a previous relationship with through family, friends, former classmates, or someone they knew in the business community. Hoene testified that he "went around driving hitting all the businesses that [he] knew in town, talking to family and friends and just letting them know, and getting the word out."

Repking, Hoene, and Oldham identified personal relationships with several individuals who were working for businesses that discontinued using SDS and became Technical Partners' customers. One of the companies, Effingham Asphalt, was owned by Hoene's immediate family. Six former customers of SDS testified at the trial that

they chose to use Technical Partners to service their computer networks because they were personally familiar with the defendants and wanted to continue to use their services. The defendants denied soliciting any of SDS's clients before they resigned.

At the trial, Schallert acknowledged that there was nothing to prohibit the defendants from leaving SDS and going to work for a competitor of SDS or opening their own business to compete with SDS. Schallert also testified that SDS's customers had the right to choose who serviced their computer networks and that SDS did not have any exclusivity contracts with any of its customers. He agreed that SDS employees could resign, go out on their own, and begin servicing SDS's customers. Schallert and Collins both testified that the customers, not SDS, owned the computers, servers, networks, passwords, and related network information located at the customers' respective business locations.

Schallert testified that if an SDS customer switched to a new computer service company, SDS would furnish the customer's computer and network information to the customer's new technician if the customer asked SDS to do so. However, SDS would not explain the intricacies of the customer's computer network to the new service provider. Repking testified that there was nothing unique or special about the networks they had serviced for SDS's customers. He explained: "A network is one, two servers in most instances, and PC's. There's usually a router for the [I]nternet and a switch to connect all the PC's to the servers." He testified, "Anybody can take care of them as long as they have some knowledge of a service and network and routers."

At the conclusion of the evidence, the circuit court found that the defendants violated the Trade Secrets Act by misappropriating SDS's customer list and confidential information concerning SDS's customers' networks, and the defendants timely appeal the circuit court's judgment. "The standard of review in a bench trial is whether the judgment is against the manifest weight of the evidence." *Chicago's Pizza, Inc. v. Chicago's Pizza Franchise Ltd. USA*, 384 Ill. App. 3d 849, 859, 893 N.E.2d 981, 991 (2008). "A judgment is against the manifest weight of the evidence only if the opposite conclusion is apparent or when findings appear to be arbitrary, unreasonable, or not based on the evidence." *International Capital Corp. v. Moyer*, 347 Ill. App. 3d 116, 122, 806 N.E.2d 1166, 1170 (2004). We hold that the circuit court's judgment in the present case is against the manifest weight of the evidence. The evidence does not support the circuit court's finding that SDS was entitled to relief under the Trade Secrets Act.

■ The Trade Secrets Act provides for injunctive relief as well as actual and punitive damages for the misappropriation of trade secrets. 765 ILCS 1065/3, 4 (West 2006). In order to establish a violation of the Trade Secrets Act, a plaintiff is required to establish that information "was (1) a trade secret; (2) misappropriated; and (3) used in the defendant's business." *Delta Medical Systems v. Mid-America Medical Systems, Inc.*, 331 Ill. App. 3d 777, 790, 772 N.E.2d 768, 780 (2002). In the present case, the circuit court held that the defendants misappropriated two categories of information which qualified as SDS's trade secrets: (1) SDS's list of customers and potential customers and (2) the intricacies of SDS's customers' networks. The evidence was insufficient to establish that this information qualified as SDS's trade secrets.

■ The Trade Secrets Act defines a "trade secret" as follows:

"(d) 'Trade Secret' means information, including but not limited to[ ] technical or non[ ]technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that:

(1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and

(2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality." 765 ILCS 1065/2(d) (West 2006).

Accordingly, in order for information to qualify as a trade secret under the Trade Secrets Act, the information must meet two requirements: first, the information must be sufficiently secret to give the plaintiff a competitive advantage, and second, the information must be subjected to affirmative measures to prevent others from acquiring or using it. *Stenstrom Petroleum Services Group, Inc. v. Mesch*, 375 Ill. App. 3d 1077, 1090, 874 N.E.2d 959, 971 (2007).

■ In addition to the statutory definition, our courts have identified six common law factors that are relevant in evaluating whether information qualifies as a trade secret: (1) the extent to which the information is known outside the employer's business, (2) the extent to which it is known by employees and others involved in the business, (3) the extent of the measures taken by the employer to guard the secrecy of the information, (4) the value of the information to the employer and to his or her competitors, (5) the amount of effort or money expended by the employer in developing the information, and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *Stenstrom Petroleum Services Group, Inc.*, 375 Ill. App. 3d at 1090, 874 N.E.2d at 971-72.

The Trade Secrets Act balances conflicting interests. *Delta Medical Systems*, 331 Ill. App. 3d at 791, 772 N.E.2d at 780. A secret advantage created by an employer through the expenditure of significant time, money, and effort should be protected from improper procurement and use. *Delta Medical Systems*, 331 Ill. App. 3d at 791, 772 N.E.2d at 780. However, in a competitive market, employees must be allowed to use their general knowledge and skills they acquire through experience in pursuing their chosen occupations. *Delta Medical Systems*, 331 Ill. App. 3d at 791, 772 N.E.2d at 780.

"[W]hether the information sought to be protected qualifies as a trade secret focuses fundamentally on the secrecy of such information." *Pope v. Alberto-Culver Co.*, 296 Ill. App. 3d 512, 515, 694 N.E.2d 615, 617 (1998). "[T]he information at issue must be substantially secret to impart economic value to both its owner and its competitors because of its relative secrecy." *Pope*, 296 Ill. App. 3d at 515, 694 N.E.2d at 617. This requirement precludes " 'protection for information not generally known to the public but clearly understood in a particular industry.' " *Service Centers of Chicago, Inc. v. Minogue*, 180 Ill. App. 3d 447, 454, 535 N.E.2d 1132, 1136 (1989), quoting M. Jaeger, Trade Secrets Law §3.04, at 3—34 (1988). In addition, "[w]here information can be readily duplicated without considerable time, effort, or expense, it is not a trade secret." *Stenstrom Petroleum Services Group, Inc.*, 375 Ill. App. 3d at 1091, 874 N.E.2d at 972.

The person claiming trade secret protection must establish that the information was known "only to him and such limited other persons to whom it may be necessary to confide it." *ILG Industries, Inc. v. Scott*, 49 Ill. 2d 88, 92, 273 N.E.2d 393, 395 (1971). The plaintiff must prove that the real value of the information "lies in the fact that it is not generally known to others who could benefit [from] using it." *Service Centers of Chicago, Inc.*, 180 Ill. App. 3d at 454, 535 N.E.2d at 1136. "It is well established that a product or service that is within the realm of general skills and knowledge in the industry cannot be a trade secret." *Pope*, 296 Ill. App. 3d at 515, 694 N.E.2d at 617.

■ In the present case, the evidence presented at the trial was insufficient to establish the "sufficiently secret" requirement of section 2(d)(1) of the Trade Secrets Act (765 ILCS 1065/2(d)(1) (West 2006)). First, concerning SDS's list of customers and potential customers, the evidence failed to establish that the names, addresses, and contact information contained in the list were not generally known by others in the computer network service industry or otherwise readily available. We find the following cases instructive on this issue.

In *Carbonic Fire Extinguishers, Inc. v. Heath*, 190 Ill. App. 3d 948, 952-53, 547 N.E.2d 675, 677 (1989), the court held that the customer

list and pricing information of a business that sold and serviced fire extinguishers and cleaned restaurant hoods was not a trade secret under the Trade Secrets Act. In that case, a former employee had possession of the employer's customer list, which included the names of customers, their addresses, their telephone numbers, the customer contact person, the date of the last servicing of a particular customer, and the price to be charged a particular customer. *Carbonic Fire Extinguishers, Inc.*, 190 Ill. App. 3d at 950, 547 N.E.2d at 675-76. The employee established his own business and solicited work from the employer's customers in the Chicago metropolitan area and in Rockford, Illinois. *Carbonic Fire Extinguishers, Inc.*, 190 Ill. App. 3d at 950, 547 N.E.2d at 675-76. The trial court granted the employer an injunction under the Trade Secrets Act that prevented the employee from contacting any of the employer's customers. *Carbonic Fire Extinguishers, Inc.*, 190 Ill. App. 3d at 949, 547 N.E.2d at 675. The appellate court, however, reversed, holding that the customer list and the pricing information were not trade secrets. *Carbonic Fire Extinguishers, Inc.*, 190 Ill. App. 3d at 954, 547 N.E.2d at 678.

In addressing the secrecy of the customer list, the appellate court noted that restaurant hood cleaning was a service commonly used by restaurants. *Carbonic Fire Extinguishers, Inc.*, 190 Ill. App. 3d at 953, 547 N.E.2d at 677. The court stated, "As such, although the actual customers using plaintiff's services are not readily apparent from the telephone directory, anyone seeking to compete with plaintiff, including defendant, could very likely encounter plaintiff's customers by simply contacting restaurants through the telephone directory." *Carbonic Fire Extinguishers, Inc.*, 190 Ill. App. 3d at 953, 547 N.E.2d at 677. The court, therefore, held that the customer list was not shown to be "sufficiently secret to derive economic value from not being generally known to other persons who could obtain economic value from its disclosure or use." *Carbonic Fire Extinguishers, Inc.*, 190 Ill. App. 3d at 953, 547 N.E.2d at 677-78.

In *McCann Construction Specialties Co. v. Bosman*, 44 Ill. App. 3d 1020, 1023, 358 N.E.2d 1340, 1342 (1977), the court held that a construction supply company's list of customers was not a trade secret where "there was no proof that the names on [the] list were not publicly available to anyone by the use of, or reference to, the yellow pages of the telephone directory or trade directories in the areas served by the parties." The court noted that the company's list contained "names of well-known contractors, utility companies[,] and various park districts and municipal bodies." *McCann Construction Specialties Co.*, 44 Ill. App. 3d at 1023-24, 358 N.E.2d at 1342.

In *Office Mates 5, North Shore, Inc. v. Hazen*, 234 Ill. App. 3d 557,

575, 599 N.E.2d 1072, 1084 (1992), a personnel placement agency maintained that it had a protectable interest in its client information, which included the following: the client's name, address, and key contact person; the client's benefit package; the type of word-processing equipment the client used; its products and services; the number of its employees; the fee the client was willing to pay for placement; and the history of placements. The court held that the client information was not protectable because the information was "readily available to anyone in the business capable of canvassing or finding a directory, whether it be the Yellow Pages or a specialized directory, placing a cold call to that business, and asking specific questions designed to elicit the information above." *Office Mates 5, North Shore, Inc.*, 234 Ill. App. 3d at 575, 599 N.E.2d at 1084.

In *Fleming Sales Co. v. Bailey*, 611 F. Supp. 507, 509 (N.D. Ill. 1985), the plaintiff was engaged in the business of manufacturing recreational vehicle component parts, and the defendant was a former general manager and salesman of the plaintiff. The employer alleged that the employee had misappropriated trade secrets, including the names of the employer's customers, information about the customers, including the names of contact people, the customers' prior purchasing and payment histories, and their projected needs and buying procedures. *Fleming Sales Co.*, 611 F. Supp. at 509.

The court granted a summary judgment in favor of the employee. *Fleming Sales Co.*, 611 F. Supp. at 509. On the issue of whether the information qualified as a trade secret, the court noted that the identity of the employer's customers was available from other sources. *Fleming Sales Co.*, 611 F. Supp. at 513. The court stated that the employer had not presented evidence to show that the employee "sought to pursue customers [that the employee] would not have discovered without [the employee's] exposure to [the employer's customer] list." *Fleming Sales Co.*, 611 F. Supp. at 513.

In *IKON Office Solutions, Inc. v. American Office Products, Inc.*, 178 F. Supp. 2d 1154, 1168 (D. Or. 2001), *aff'd*, 61 F. App'x. 378 (9th Cir. 2003) (unpublished memorandum), the court denied trade secret status to a copier equipment business's customer list. Although that case did not involve Illinois law, we find the following language from that decision to be persuasive: "Eugene, Oregon, is a comparatively small market. A person with a rudimentary knowledge of the industry, the Yellow Pages, and business data publicly available from sources such as the Chamber of Commerce can quickly identify the principal consumers of copying equipment in that region." *IKON Office Solutions, Inc.*, 178 F. Supp. 2d at 1168.

In the present case, the evidence at the trial was insufficient to

establish that the identity and contact information of potential customers of computer network services was sufficiently secret to qualify for trade secret status. In today's modern world, computers and computer networks are common business tools, and all businesses are potential customers of computer network services. Locating potential customers is merely a matter of identifying businesses in a particular town, county, or area and looking up their contact information. This information is easily obtained from telephone directories, chamber of commerce directories, the Internet, and a variety of other sources. "[W]here customer information is readily available to competitors through normal competitive means, no protectable interest exists." *Office Mates 5, North Shore, Inc.*, 234 Ill. App. 3d at 575-76, 599 N.E.2d at 1085. A trade secret must be something kept from the general public and not susceptible to common knowledge.

We note that SDS's customer list is merely a listing of names, addresses, and telephone numbers. The list encompasses a wide range of retail businesses, service businesses, and government offices, including, but not limited to, accountants, lawyers, restaurants, mechanics and other auto service businesses, doctors, insurance agencies, utilities, exterminators, construction companies, schools, health care facilities, retail businesses of all types, banks, real estate agencies, municipalities, county clerks, circuit court clerks, sheriff departments, county treasurer offices, State's Attorneys' offices, manufacturers, county health departments, and pharmacies. Many of these listings were merely potential customers with whom SDS had no prior business relationship. The information on this list is general information and is common knowledge to people in the computer service trade or is otherwise readily available information. Competitors in the computer network industry can quickly identify potential customers in a given area by referring to directories and other sources of publicly available data.

Effingham County is a fairly rural county and a comparatively small market. We take judicial notice that the population of Effingham County is slightly more than 34,000 residents (Effingham County QuickFacts from the U.S. Census Bureau (2007), http://quickfacts .census.gov/qfd/states/17/17049.html), and the population of the City of Effingham is slightly more than 12,000 residents (U.S. Census Bureau, Census 2000, Table DP-1, Profile of General Demographic Characteristics: 2000, *available at* http://censtats.census.gov/data/IL/ 1601722736.pdf). See *DiModica v. Department of Employment Security*, 164 Ill. App. 3d 445, 448, 517 N.E.2d 1197, 1199 (1987) (a reviewing court may judicially notice population figures). The defendants were longtime residents of Effingham County; two of them were lifelong

residents with large, prominent families in the area. The evidence at the trial established that the defendants had personal relationships with many people in the community through family, friends, classmates, and contacts made from simply being longtime members of the rural community. These family members, friends, and acquaintances included people who worked for several of the businesses listed on SDS's client list. There is nothing secretive about the identity of these contacts. The trial court's judgment, however, improperly prevents the defendants from competing for the business of their friends, family members, and personal acquaintances merely because SDS included them or their place of employment on its customer list. This is an overly broad application of the Trade Secrets Act.

All the defendants developed personal relationships with people at the businesses they serviced while employed with SDS. The evidence established that the defendants were able to lure those customers away from SDS to Technical Partners because of those personal relationships, not because of SDS's client list. SDS did not present any evidence to establish that the defendants would not have pursued any of SDS's customers without its customer list. We conclude that the evidence was insufficient to establish that the information contained on SDS's customer list was sufficiently secret to qualify as a trade secret. The circuit court's finding that SDS's list of customers and potential customers was a trade secret was against the manifest weight of the evidence.

SDS cites *Stampede Tool Warehouse, Inc. v. May*, 272 Ill. App. 3d 580, 651 N.E.2d 209 (1995), in support of the trial court's findings that its customer list was entitled to trade secret protection. *Stampede Tool Warehouse, Inc.*, however, is distinguishable because that case "concerned [a] unique, highly specialized[,] and narrow market[ ] where *** the development of customer lists *** require[d] serious effort and expense." *Dicks v. Jensen*, 172 Vt. 43, 48-49, 768 A.2d 1279, 1283 (2001) (distinguishing *Stampede Tool Warehouse, Inc.*). The plaintiff in *Stampede Tool Warehouse, Inc.* was involved in a "niche market" that sold tools and equipment to "mobile tool jobbers," and locating tool jobbers required substantial time and effort because a list of tool jobbers was not readily available. *Stampede Tool Warehouse, Inc.*, 272 Ill. App. 3d at 587, 651 N.E.2d at 215. By contrast, in the present case, computer networking services for businesses is not a niche market. Every business and government office in a given community is a potential customer for those services, and lists of those businesses and units of government are readily available and easily obtained from multiple sources. Although Schallert denied creating SDS's customer list from a telephone book or the Internet, nothing prevents other people in the industry from doing so.

Second, in addition to SDS's customer list, the circuit court also found that the intricacies of SDS's customers' computer systems and networks were also SDS's protectable trade secrets. The circuit court's memorandum of decision stated that "information about customers' needs and networks qualifies as a protectable trade secret." We hold that the evidence was insufficient to establish that the intricacies of SDS customers' computer systems and networks qualified as trade secrets belonging to SDS.

SDS did not present evidence that its technicians installed or utilized anything proprietary in servicing computers and networks. On the contrary, the testimony at the trial established that the customers owned their computer systems, networks, and related information, not SDS. Accordingly, SDS cannot invoke trade secret protection for the intricacies of its customers' computer systems and networks. Information concerning a customer's computer system, passwords, and network "was the customer's own information," and SDS "cannot control what a customer does with its own information." *Delta Medical Systems*, 331 Ill. App. 3d at 794, 772 N.E.2d at 783.

SDS did not establish that its technicians serviced its clients' computers and networks in a way that was novel or unknown to any other technician in the computer service and network industry performing the same services. *Carbonic Fire Extinguishers, Inc.*, 190 Ill. App. 3d at 954, 547 N.E.2d at 678 ("[p]laintiff does not contend that its price for a job is unique or not generally known to others in the business"). Repking testified that there was nothing unique or special about the networks they serviced for SDS's customers and that any computer technician "can take care of them as long as they have some knowledge of a service and network and routers." Accordingly, we hold that the defendants' knowledge of the specific computer systems and networks that they worked on while employed with SDS was akin to general skills and knowledge acquired in the course of employment. *Midwest Micro Media, Inc. v. Machotka*, 76 Ill. App. 3d 698, 704, 395 N.E.2d 188, 192 (1979) ("knowledge of the individual customers is closely akin to his personal skills and abilities as a salesman and thus cannot be considered plaintiff's property"). By servicing SDS's customers' computer systems and networks, the defendants naturally carried away familiarity with those systems when they left SDS. "[The] defendants cannot be compelled to erase from their minds the knowledge gained from working on a particular piece of [computer] equipment." *Delta Medical Systems*, 331 Ill. App. 3d at 793, 772 N.E.2d at 782.

In *Fleming Sales Co.*, an employer sought trade secret protection for information about its customers that a salesman learned while

working for the employer. *Fleming Sales Co.*, 611 F. Supp. at 514. In denying the employer trade secret protection, the court noted that the information the employer wanted protected was "nothing more than the kind of knowledge any successful salesman necessarily acquires through experience." *Fleming Sales Co.*, 611 F. Supp. at 514. The court concluded that the employee's knowledge of information about the employer's customers was not a trade secret but, rather, that information involved "general skills and knowledge acquired in the course of employment." *Fleming Sales Co.*, 611 F. Supp. at 514.

In the present case, the evidence established that the defendants worked on various computer systems and networks of various customers of SDS and obviously acquired knowledge of the customers' computer systems and networks in the process. However, the evidence did not establish that this information was anything more than the kind of knowledge a competent computer technician necessarily acquires through experience. In fact, Schallert testified that when an SDS customer made a service request, it would send a technician to the customer's place of business to "learn about their networks." Accordingly, the intricacies of a customer's computer system or network are readily accessible to other technicians in the competitive marketplace by similar means. Information that is "within the realm of general skills and knowledge in the industry cannot be a trade secret." *Pope*, 296 Ill. App. 3d at 515, 694 N.E.2d at 617.

Any employee will gain general skills and knowledge during the course of employment. An employer who is concerned that an employee's knowledge and experience will give the employee an unfair competitive advantage is not without protective options. *Fleming Sales Co.*, 611 F. Supp. at 514. The employer has the option of requiring employees to enter into restrictive covenants, but SDS did not utilize this option. "[I]t would really be unfair competition to allow the employer *without* such a covenant to obtain trade secret status for the fruits of ordinary experience in the business, thus compelling former employees to reinvent the wheel as the price for entering the competitive market." (Emphasis in original.) *Fleming Sales Co.*, 611 F. Supp. at 515.

There is conflicting testimony in the record concerning the extent to which SDS kept its customer list and its client information confidential with passwords, employee-confidentiality agreements, provisions in SDS's employee handbook, paper shredders, and other measures. However, the measures SDS took to keep its information confidential is only one element of the "trade secrets" definition in section 2(d) of the Trade Secrets Act (765 ILCS 1065/2(d) (West 2006)). The information must be sufficiently secret in the first place, regard-

less of the security measures taken by SDS. "All the efforts in the world to preserve confidentiality of information will not suffice if the information is not secret in the first place—if it is 'readily ascertainable' by other proper means." *Fleming Sales Co.*, 611 F. Supp. at 513. The plaintiff cannot, by implementing security measures, bestow trade secret status to information that is already commonly known in the industry, is readily ascertainable, or is in the nature of the personal skills and abilities of employees developed during the course of their employment.

Since the evidence presented at the trial fails to establish that SDS's information meets the requirements of section 2(d)(1) of the Trade Secrets Act, we need not analyze the evidence concerning whether SDS implemented sufficient safeguards as required under section 2(d)(2) of the Trade Secrets Act (765 ILCS 1065/2(d)(1), (d)(2) (West 2006)). In addition, because the information SDS sought to protect does not qualify as a trade secret, we need not analyze the evidence concerning whether the defendants "misappropriated" the information. See 765 ILCS 1065/2(b) (West 2006).

## CONCLUSION

For the foregoing reasons, we reverse the judgment of the circuit court of Effingham County.

Reversed.

WELCH and DONOVAN, JJ., concur.