# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

*Illinois School District Agency v. St. Charles Community Unit School District 303,*
**2012 IL App (1st) 100088**

---

| | |
|---|---|
| Appellate Court Caption | ILLINOIS SCHOOL DISTRICT AGENCY, Plaintiff-Appellant and Cross-Appellee, v. THE ST. CHARLES COMMUNITY UNIT SCHOOL DISTRICT 303, a Unit of Local Government, Defendant-Appellee and Cross-Appellant. |
| District & No. | First District, Sixth Division<br>Docket Nos. 1-10-0088, 1-10-2005 cons. |
| Filed | March 30, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action arising from a dispute over defendant school district's insurance coverage for mold claims, the appellate court rejected the district's argument for the extension of the targeted tender rule beyond cases involving concurrent insurance policies where the policies at issue were all consecutive and, therefore, the appellate court reversed the trial court's ruling that the selective tender rule applied to compel plaintiff, an agency established by several school districts to pool their risks by offering insurance coverage for purchase by members, to defend the mold claims alone, without equitable contribution; however, the appellate court rejected the district's argument that invoices from a mold expert retained separately by the district and the agency were for litigation purposes and were subject to reimbursement under the policy and upheld the finding that the invoices were the district's responsibility. |

| | |
|---|---|
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 03-CH-2413; the Hon. Nancy J. Arnold, Judge, presiding. |
| Judgment | Reversed in part and affirmed in part; cause remanded. |
| Counsel on Appeal | Daniel J. Zollner, of Dykema Gossett PLLC, and J. Timothy Eaton, Patricia S. Spratt, and Michael P. Sheehan, all of Shefsky & Froelich Ltd., both of Chicago, for appellant. |
| | Scott O. Reed, of Donnelly, Lipinski & Harris, LLC, and Michael J. Duggan, of Klein, Thorpe & Jenkins, Ltd., both of Chicago, for appellee. |
| Panel | PRESIDING JUSTICE GARCIA delivered the judgment of the court, with opinion. Justices McBride and R. Gordon concurred in the judgment and opinion. |

**OPINION**

¶ 1     Plaintiff Illinois School District Agency (ISDA), a provider of commercial general liability insurance, appeals the circuit court's ruling that defendant St. Charles Community Unit School District 303 (District) properly targeted the ISDA to defend the District in a series of lawsuits stemming from mold infestation in the District's high school building, over other insurers that issued policies covering the District prior to the policy issued by the ISDA. Illinois is one of only three states that allow an insured to selectively tender the defense of a lawsuit to one insurer over other chronologically *concurrent* insurers. The Illinois Supreme Court has never approved extending this uncommon right to include chronologically *consecutive* insurance policies. The policy grounds underlying the selective tender rule do not apply to past insurers where the risk of increased premiums or the risk of policy cancellation does not exist. We reverse the circuit court's grant of summary judgment in favor of the District on counts II, III and IV of the ISDA's amended complaint; we remand for further proceedings consistent with this opinion. We reject the District's cross-appeal challenging the circuit court's judgment in favor of the ISDA on the District's counterclaim that it was entitled to reimbursement for certain invoices from the same mold expert separately retained by the ISDA and the District.

¶ 2 BACKGROUND

¶ 3 The District is a public entity that oversees St. Charles East High School, which suffered a mold infestation that gave rise to this case. The ISDA was established by certain school districts of Illinois to pool their risk. It offers for purchase by its members insurance coverage, much like ordinary commercial insurance carriers. The ISDA provided commercial general liability (CGL) insurance coverage to the District from July 1, 1995, through July 11, 2001. Its policy provided that the ISDA "will have the right and duty to defend any 'suits' seeking *** damages." It also provided that the ISDA "will pay, with respect to any claim or 'suit' we defend: *** All reasonable expenses incurred by the [District] at our request to assist us in the investigation or defense of the claim or 'suit.' "

¶ 4 Prior to coverage by the ISDA, the District held CGL policies with General Casualty Company of Wisconsin (General Casualty) from September 1, 1971, to September 1, 1974, Employers Fire Insurance Company from October 1, 1974, to October 1, 1977, Hartford Accident and Indemnity Company (Hartford) from October 1, 1977, to July 1, 1985, and Indiana Insurance Company (Indiana) from October 1, 1985, to July 1, 1995.

¶ 5 The Mold Lawsuits

¶ 6 In March 1999, the District notified the ISDA that it faced potential tort liability stemming from mold exposure to St. Charles East High School students. The ISDA reserved its rights and retained attorney Robert Smyth of the law firm of Donohue, Brown, Mathewson & Smyth to investigate and monitor mold-based claims.

¶ 7 Between March 2001 and March 2002, three separate lawsuits were filed against the District alleging the District's negligence caused the former students to suffer mold-related injuries. In April 2001, the District tendered the defense of the suits to the ISDA and Indiana. On June 26, 2001, the ISDA accepted the defense of the suits against the District, subject to a reservation of rights; the ISDA retained attorney Smyth to represent and defend the District in the lawsuits. On August 21, 2001, the District tendered the defense of the lawsuits to Hartford and General Casualty as well. On September 7, 2001, Hartford acknowledged receipt of the tender. On September 24, 2001, Indiana agreed to defend the District pursuant to a reservation of rights. On October 1, 2001, General Casualty acknowledged receipt of the tender, reserved its rights, and declined to defend. On February 15, 2002, Hartford agreed to defend against the lawsuits under a reservation of rights.

¶ 8 In a letter dated March 19, 2002, the District's coverage counsel, Scott Reed, informed the ISDA that the District "has now obtained defense of the [action] under a reservation of rights from all primary general liability insurers with coverage in force on an occurrence basis from October 1, 1981 through July 11, 2001."

¶ 9 As a result of the mold problem, the District employed several contractors and experts to investigate and remedy the mold infestation. On July 23, 2002, Reed provided the ISDA, Indiana, and Hartford with copies of the "expert and consultant bills to date" generated by these services, which totaled approximately $2.2 million.

¶ 10                    Hartford, Indiana, and General Casualty Settle

¶ 11     On August 14, 2002, Hartford sued the District in federal court, asserting it was not obligated to reimburse the District for the expert and consultant bills the District had incurred. On or about October 16, 2002, Hartford and the District reached a settlement whereby Hartford paid the District $150,000 in exchange for the District's "de-activation" of its tender of defense, which rendered moot its claim for indemnity. The agreement was fully executed on November 20, 2002. It provided that Hartford's payment satisfied its obligations to the District, including

> "any costs and expenses incurred by The School District in defense or indemnity of the Underlying Lawsuits, or any other costs associated with the mold remediation which were incurred on or before October 14, 2002. These costs and expenses include, but are not limited to, AAA Environmental, Golan Harris, Holian Asbestos Removal, Carnow Conibear, Judge & James, Raths Raths & Johnson, Shirmer Engineering, STS Consultants, Air Quality Services, HP Woods, and Donohue Brown Mathewson & Smyth [hereinafter, the vendors]."

In a letter dated November 22, 2002, the District informed the ISDA's in-house claims handler and its outside counsel that the District and Hartford had reached a settlement agreement, "the terms of which are confidential." Pursuant to the settlement, the District withdrew its tender to Hartford effective October 14, 2002.

¶ 12     On December 9, 2002, the District settled with Indiana. It deactivated its tender in exchange for a $500,000 payment. The settlement included language substantially similar to that of the Hartford settlement in that Indiana's payment satisfied obligations as to both litigation defense and reimbursement of mold remediation expenses provided by the same vendors listed in the Hartford settlement. The District also informed the ISDA's claims handler and outside counsel of this agreement, the terms of which were declared confidential. A similar settlement was reached between the District and General Casualty for $10,000.

¶ 13     The District's reimbursement claims arose from its payment of certain vendors from its own funds. When it later received the settlement proceeds, it deposited the proceeds into the District's "Educational Fund," which it used to pay general operating expenses.


¶ 14                                    The Lawsuits

¶ 15     The District remained in settlement discussions with the ISDA and apparently believed the discussions would continue. The ISDA, however, filed the instant action against the District on February 6, 2003. Count I of the lawsuit sought a declaration that the ISDA had no obligation to cover mold remediation expenses unrelated to the defense of the mold lawsuit; count II alleged the District's "secret" settlements with the other three insurers breached its insurance contract with the ISDA. On September 30, 2005, the District filed an answer and a four-count counterclaim. Count I of the counterclaim sought a declaration that the ISDA was obliged to cover mold remediation costs in addition to litigation defense expenses; count II alleged the ISDA had breached its contract with the District by failing to compensate the District for remediation and litigation defense costs; count III sought to recover costs and attorney fees the District incurred in pursuing insurance coverage from the

other insurers; and count IV sought penalties against the ISDA pursuant to section 155 of the Insurance Code (215 ILCS 5/155 (West 2004)) for the ISDA's "vexatious and unreasonable delay" in providing the insurance coverage to which the District was entitled.

¶ 16 The ISDA moved to dismiss all four counts of the counterclaim. On May 4, 2006, the circuit court denied the motion as to counts I through III, but granted it as to count IV. On June 21, 2010, the court entered judgment for the ISDA on count III of the counterclaim. The District does not challenge these rulings on cross-appeal.

¶ 17 On January 27, 2006, the District moved for partial summary judgment on count I of its counterclaim that sought reimbursement under the ISDA policy for mold remediation expenses that it claimed also aided the litigation, and on count II of the ISDA's lawsuit that claimed the settlements with the three other insurers and deactivations of tender breached the ISDA's insurance contract. Following oral argument, Judge Nancy Arnold denied the District's summary judgment motion as to count I of the counterclaim. As to the District's summary judgment motion regarding count II of the ISDA's complaint, the ISDA argued that the District's deactivations of tender to Hartford, Indiana, and General Casualty were improper because the District was compensated for the deactivations. Judge Arnold ruled no legal distinction existed between compensated and uncompensated deactivation of tender: "I don't see any real dispute in your response, frankly. *** There is a little argument made with no support saying there is a distinction here. But there's no case law telling me the distinction has any legal basis."

¶ 18 On June 14, 2006, the circuit court entered summary judgment for the District on count II of the ISDA's complaint, holding the District had the right to deactivate tender of the litigation defense as to the other three insurers and that doing so in exchange for settlement payments did not breach its policy with the ISDA. With a favorable ruling on the same claim by the ISDA, the District voluntarily dismissed count II of its counterclaim, claiming a policy breach by the ISDA. The court, however, granted leave to the ISDA to file an amended complaint alleging the District received a "double recovery" from its settlement with the other insurers and the unspecified insurance proceeds it received from the ISDA.

¶ 19 The ISDA moved for reconsideration of the court's ruling on the compensated deactivation of tender, which the court denied on August 14, 2006. On November 7, 2007, the ISDA again moved the court to reconsider, this time based on a relatively new case, *Kajima Construction Services, Inc. v. St. Paul Fire & Marine Insurance Co.*, 368 Ill. App. 3d 665 (2006), *aff'd*, 227 Ill. 2d 102 (2007). At oral argument, Judge Arnold observed that *Kajima* stood only for the proposition that an insured cannot selectively tender defense of a lawsuit to an insurer based on an excess insurance policy when the insured still has available primary insurance policies. The circumstances in *Kajima* were not the circumstances in the instant case and thus did not warrant reconsideration of the ISDA's claim.

¶ 20 On June 8, 2008, the ISDA filed an amended complaint, adding count III, which sought setoff or restitution of amounts paid in defending and settling the litigation, and count IV, which argued for proration or restitution from the District for the amount it allegedly paid in excess of its "allocable pro rata share" of defense costs in the lawsuits. The ISDA then filed a "Motion for Setoff of Insurance Settlement Proceeds," arguing that the District

"breached its express duties, implied duty of good faith, and fiduciary duties under the ISDA Agreement"; that the District "received a double recovery of defense and indemnity costs, received a windfall profit and has been unjustly enriched"; and that the District's settlement agreements with the other insurers "intentionally prejudiced [the] ISDA by releasing its right to equitable contribution." The District responded that it had actually recovered less than one-third of its investigative costs and therefore received no windfall and breached no duty to the ISDA. On December 4, 2009, the circuit court denied the ISDA's motion and entered judgment for the District on counts III and IV of the ISDA's amended complaint. The record before us contains no findings of fact or conclusions of law as to the order of December 4, 2009, which is unaccompanied by any transcript of the proceedings.

¶ 21     The ISDA remained the lone insurer that defended and indemnified the District in the lawsuits, which settled for $90,000 in September 2007. The ISDA alleges it paid "$550,889 in defense fees and expenses related to the Mold Lawsuits, and $90,000 to settle the Mold Lawsuits," for a total expenditure of $640,889.[1]

¶ 22     The ISDA timely appeals, following the circuit court's order of June 21, 2010, which disposed of count III of the District's counterclaim, the last issue in the case.

¶ 23                                          The Cross-Appeal

¶ 24     The District cross-appeals from the circuit court's judgment in the ISDA's favor on count I of the District's counterclaim and count I of the ISDA's amended complaint. Before the circuit court, the parties submitted cross-motions for partial summary judgment regarding "whether disputed invoice entries from Dr. James Woods are legitimate defense costs as to which [the ISDA] owes a duty to reimburse [the District], or whether these invoice entries represent services requested by [the District] for its efforts to remediate the mold condition in its physical plant." The court's previous orders of June 14, 2006, and April 24, 2008, had established that the ISDA had no duty to indemnify the District for remediation under the CGL policy. The court resolved the cross-motions for reimbursement on the disputed invoices in "a bench trial," pursuant to a joint stipulation. On May 22, 2009, the court issued written "Findings of Fact and Entry of Judgment After Stipulated Trial." In the course of the stipulated trial, the court considered the briefs, exhibits, oral arguments, and the depositions of expert Woods and attorney Smyth.

¶ 25     The court found Dr. Woods was "an expert originally retained by the ISDA defense counsel, Robert Smyth, but then separately retained by [the District] for its own purposes." It noted that the ISDA had only paid a portion of expert Woods' invoices, contending the unpaid invoices were allocable to mold remediation, not litigation defense. Under the language of the ISDA's policy, the "ISDA was obligated to pay for expenses it actually incurred, and all reasonable expenses incurred by [the District] at ISDA's request to assist in the investigation or defense of the mold litigation." The court agreed with the case law

---

[1]The ISDA also states at page 22 of its brief that "[t]he total spent by [the] ISDA to defend and settle the Mold Lawsuit was $715,674." The discrepancy of $74,785 between the two totals is the amount for "allocated Loss (Claim Adjustment) Expenses."

cited by the District, *Aerojet-General Corp. v. Transport Indemnity Co.*, 948 P.2d 909, 924 (Cal. 1997), that "the burden of proving the existence, amount, reasonableness, and necessity of site investigation as defense costs rests with the insured." However, the circuit court found *Aerojet* and the other cases cited by the District distinguishable because the remediation measures undertaken by the insureds in those cases were compelled by government environmental cleanup regulations, which triggered the duty of the insurers to indemnify for the remediation costs. The court noted: "The mold infestation at St. Charles High School did not need to be corrected to avoid potential liability in any of the lawsuits."

¶ 26    The court then turned its attention to the disputed invoices from expert Woods. The question for the court was whether the disputed invoice entries represented reasonable expenses incurred for defense purposes at the ISDA's request. The court "reject[ed] [the District's] argument that where Woods' work was useful for remediation and litigation, the court should arbitrarily order each party to bear half of the costs." It found "relevant, but not conclusive, the fact that [the District] internally coded these expenditures as construction, capital improvement, or operation and maintenance costs." The court found that Woods' work on the "Seven-Step Protocol," a step-by-step plan for some of his work at the high school, "was done pursuant to [the District's] request, was not requested by the defense counsel engaged by the ISDA, and was implemented for the purpose of remediation, not litigation." Turning to specific invoices, the court found the invoices dated April 26, 2001, and May 16, 2001, were properly chargeable to litigation expenses, which the ISDA was obligated to pay. The ISDA does not appeal that finding.

¶ 27    The court next found the "overwhelming evidence" indicated the May 14-16 entry pertained to meetings and preparation requested by the District for purposes of mold remediation. The court observed, "The remaining invoices were all billed to [the District]" through its superintendent. It found "[the District] bears the burden of proving that the expenses listed are reasonable expenses incurred at the ISDA's request to assist in the investigation or defense of the mold litigation." With regard to each of the remaining invoices, dated June 14, August 6, October 1, and December 31, 2001, consistent with the deposition testimony of Woods that the work "was needed for remediation [but] could be used for forensic[s]," the court found the work predominately served to remedy the school's mold infestation. Judge Arnold ruled the possible dual purpose of the work was "not sufficient to establish that the work represented *** was performed at the ISDA's request to aid it in the mold litigation." Accordingly, the court held the ISDA had no obligation to pay any of the remaining disputed invoices.

¶ 28    The District timely cross-appeals.


¶ 29                                    ANALYSIS

¶ 30    The ISDA contends the District violated the terms of its insurance policy by entering into "secret" settlements with the other insurers and tendering the defense of the mold litigation to the ISDA alone. It argues these actions constituted a breach of the District's purported fiduciary duty to the ISDA and that the District received a "windfall" in the amount of the insurance proceeds it received that exceeded the amount of its litigation costs. The ISDA

seeks a setoff or restitution of that amount. The District counters that an insured party has a paramount right to tender defense of a lawsuit to any primary insurer it chooses, that an insured owes no fiduciary duty to an insurer, and that the mold infestation cost the District far more than the sum of the settlements it received. In its cross-appeal, the District urges that the ISDA is liable for a greater portion of the Woods invoices than the circuit court allowed. The ISDA responds that the court ruled based on the evidence before it when it found the ISDA not liable for the invoices in question.

¶ 31    We note that the District's responsive brief contains 34 single-spaced footnotes, many of which advance substantive arguments, in the span of 64 pages. "Footnotes are discouraged, but if used must be double-spaced." Ill. S. Ct. R. 341(a) (eff. July 1, 2008). "Substantive arguments may not be made in footnotes." *Technology Solutions Co. v. Northrop Grumman Corp.*, 356 Ill. App. 3d 380, 382 (2005) (*sua sponte* striking all footnotes from the parties' briefs where their briefs contained slightly more footnotes per page than the District's). While we grant the District greater lenience than did the court in *Technology Solutions*, we caution counsel for the District that supreme court rules are not mere suggestions.

¶ 32                    The ISDA's Appeal–Selective Tender

¶ 33    We agree with the parties that our review of the circuit court's summary judgement order finding the District in compliance with the ISDA insurance contract is subject to *de novo* review. *Kajima*, 227 Ill. 2d at 106 ("This court conducts a *de novo* review of an order granting summary judgment."); *Avery v. State Farm Mutual Automobile Insurance Co.*, 216 Ill. 2d 100, 129 (2005) ("the construction, interpretation, or legal effect of a contract is a matter to be determined by the court as a question of law"). "Summary judgment is appropriate where the pleadings, depositions, admissions and affidavits on file, viewed in the light most favorable to the nonmoving party, reveal that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Kajima*, 227 Ill. 2d at 106 (citing 735 ILCS 5/2-1005(c) (West 2006)).

¶ 34    The ISDA notes the parties' insurance agreement expressly provides the ISDA's coverage is applicable only as excess over other applicable insurance. It argues the District breached the policy's provision of "other insurance" when the District, through its settlements with Indiana, Hartford, and General Casualty, foreclosed the ISDA from seeking equitable contribution from these other insurance companies for the mold litigation. The District counters that it had the unfettered right to tender the defense of the lawsuits to any of its insurers.

¶ 35    "[T]he doctrine of equitable contribution allows [an insurer] to be reimbursed by other insurers that are also liable for [a] loss." *American States Insurance Co. v. CFM Construction Co.*, 398 Ill. App. 3d 994, 998 (2010). It " 'arises from a right, which is independent from the rights of the insured, to recover from a co-obligor who shares the same liability as the party seeking contribution.' " *Id.* (quoting *Argonaut Insurance Co. v. Safway Steel Products, Inc.*, 355 Ill. App. 3d 1, 10-11 (2004)). "The purpose of the doctrine is to provide a remedy when one insurer has paid a debt that is equally owed by another insurer."

*CFM*, 398 Ill. App. 3d at 998. " 'The fact that one insurer undertakes the burden of a full settlement payment does not mean the insurer is a volunteer.' " *Id.* (quoting *Chicago Hospital Risk Pooling Program v. Illinois State Medical Inter-Insurance Exchange*, 325 Ill. App. 3d 970, 981 (2001)). "Equitable 'contribution applies to \*\*\* policies [that] insure the same entities, the same interests, and the same risks.' " *CFM*, 398 Ill. App. 3d at 998 (quoting *Home Insurance Co. v. Cincinnati Insurance Co.*, 213 Ill. 2d 307, 316 (2004)).

¶ 36     The District does not argue that the ISDA failed to meet the criteria for equitable contribution; rather, it contends the ISDA is ineligible for equitable contribution arising from the doctrine's exception known as the targeted tender or selective tender rule. "[T]he 'targeted' or 'selective' tender doctrine allows an insured covered by multiple insurance policies to select or target which insurer will defend and indemnify it with regard to a specific claim." *Kajima*, 227 Ill. 2d at 107; *John Burns Construction Co. v. Indiana Insurance Co.*, 189 Ill. 2d 570, 574 (2000); *Cincinnati Cos. v. West American Insurance Co.*, 183 Ill. 2d 317, 323 (1998). " 'Where an insured makes such a designation, the duty to defend falls solely on the selected insurer. That insurer may not in turn seek equitable contribution from the other insurers who were not designated by the insured.' " *Burns*, 189 Ill. 2d at 575 (quoting *Cincinnati*, 183 Ill. 2d at 324). "The insured may choose to forgo an insurer's assistance for various reasons, such as the insured's fear that premiums would be increased or the policy cancelled, in the future." *Cincinnati*, 183 Ill. 2d at 326. The insured is also " 'permitted to deactivate coverage with a carrier previously selected for purposes of invoking exclusive coverage with another carrier.' " *Kajima*, 227 Ill. 2d at 110-11 (quoting *Alcan United, Inc. v. West Bend Mutual Insurance Co.*, 303 Ill. App. 3d 72, 83 (1999)).

¶ 37     In 2001, Justice Quinn of the First District observed that Illinois's status as one of a very small minority of states that employ the targeted tender doctrine is not one of distinction: "In the vast area of legal jurisprudence, there are undoubtedly many instances where being the first, or only, jurisdiction to grant rights to persons or entities may rightly be a source of pride. While it is still very early, the doctrine of 'selective tender' does not appear to me to be one of those instances." *Chicago Hospital Risk Pooling Program*, 325 Ill. App. 3d at 987 (Quinn, J., specially concurring). Ten years later, our research has identified Montana and Washington as the only other states recognizing the right of selective tender. See *XL Specialty Insurance Co. v. Progressive Casualty Insurance Co.*, 411 F. App'x 78, 81 (9th Cir. 2011) (citing *Casualty Indemnity Exchange Insurance Co. v. Liberty National Fire Insurance Co.*, 902 F. Supp. 1235, 1237, 1238 & n.3 (D. Mont. 1995), citing *Institute of London Underwriters v. Hartford Fire Insurance Co.*, 234 Ill. App. 3d 70 (1992)); *Mutual of Enumclaw Insurance Co. v. USF Insurance Co.*, 191 P.3d 866, 873 (Wash. 2008). As such, we tread with caution when the application of this right, which is uncommonly generous to insured parties, falls outside of the circumstances previously approved by our supreme court.

¶ 38     The ISDA contends the "other insurance" clause of its policy entitled it to equitable contribution from the District's other insurers. The clause provides:

"Coverage provided by this Plan shall apply only as excess over other insurance and/or coverage applicable to a loss hereunder regardless of whether such other coverage provides primary, excess, umbrella or contingent coverage. When both this coverage and

other insurance apply to the loss on the same basis, whether excess or contingent, the Agency shall not be liable under this Plan for a greater proportion of the loss than that stated in the [contribution by equal shares provision]."

"Other insurance" excess clauses such as this one are "an effort to override [an insured's right] to choose among co-insurers." *River Village I, LLC v. Central Insurance Cos.*, 396 Ill. App. 3d 480, 487 (2009). Such provisions, as in this case, "attempt to render otherwise primary insurance as excess over any other collectible insurance, most often with statements in the policy that declare the insurer's coverage to be excess over any other valid and collectible insurance available to the insured." *Id.* "An 'other insurance' provision does not in itself overcome the right of an insured to tender defense of an action to one insurer alone." *Burns*, 189 Ill. 2d at 578. Accordingly, the existence of the "other insurance" clause is not dispositive. Nor are we inclined to address in this case whether a legal distinction exists between compensated and uncompensated deactivation of tender, as the circuit court below rejected.

¶ 39 Rather, we deem the dispositive issue to be whether an insured's right to selective tender among chronologically concurrent policies extends to consecutive ones such as the policies at issue in this case. There is no supreme court precedent for doing so. See *Kajima*, 227 Ill. 2d at 117; *John Burns Construction Co. v. Indiana Insurance Co.*, 189 Ill. 2d 570 (2000); *Cincinnati*, 183 Ill. 2d at 317. The most recent supreme court decision on the selective tender rule suggests that the insurance policies must be concurrent for the rule to apply: "[T]argeted tender can be applied to circumstances where *concurrent* primary insurance coverage exists." (Emphasis added.) *Kajima*, 227 Ill. 2d at 117 (insured could not selectively tender lawsuit defense to one insurance carrier over another where the two policies were not concurrent primary policies); see also Lee R. Russ & Thomas F. Segalla, Couch on Insurance § 200:37 (3d ed. 2007) (citing *Kajima* for the proposition that "the selective tender rule is only applicable to concurrent insurance coverage and not consecutive primary or excess coverage policies where other primary coverage is available"). Accordingly, where coverage is not concurrent, but rather consecutive as it was in this case, we do not read the authority the District relies upon as foreclosing the ISDA's claim for equitable contribution by invoking the targeted tender exception.

¶ 40 In *River Village*, this court declined to apply the targeted tender rule to a policy determined to provide "excess coverage," consistent with the supreme court's decision in *Kajima*. *River Village*, 396 Ill. App. 3d at 492. The *River Village* court noted: "The targeted tender doctrine allows an insured who is covered by *multiple and concurrent insurance policies* to select, or 'target,' which insurer he wants to defend and indemnify him regarding a specific claim." (Emphasis added.) *Id.* at 486. *River Village* is not authority for the District's claim in the instant case.

¶ 41 We are aware of only one Illinois case that appears to have applied the targeted tender rule to consecutive insurance policies, a case which the District acknowledged at oral argument is not factually on point for the issue before us. See *Richard Marker Associates v. Pekin Insurance Co.*, 318 Ill. App. 3d 1137 (2001).

¶ 42 In that case, architect Marker was insured by Pekin Insurance Company from August 25,

1991, to August 25, 1992, and by Statewide Insurance Company beginning on August 25, 1992. *Id.* at 1139. Marker was sued by a client and tendered defense of the suit to both insurance companies. *Id.* Marker then withdrew his tender to Statewide, leaving only Pekin to indemnify Marker after he settled with the former client. *Id.* In Pekin's suit for equitable contribution from Statewide, the circuit court granted Pekin summary judgment. *Id.* at 1140. The appellate court reversed, holding that Pekin was not entitled to equitable contribution from Statewide precisely "because Marker had elected to forgo coverage under Statewide's policy." *Id.* at 1145. The *Marker* court acknowledged that "our courts have chosen to protect the insured's right to choose or knowingly forego coverage." *Id.* at 1144. An insured's decision to forego coverage by one insurer in favor of another was explained by "the insured's fear that premiums would be increased or the policy canceled in the future." *Id.* at 1141 (citing *Cincinnati*, 183 Ill. 2d at 326, and *Alcan*, 303 Ill. App. 3d at 79).

¶ 43    That explanation for the selective tender rule has no application in this case. The District selectively tendered the defense of its litigation to its current insurer, the ISDA. Thus, the District could not have acted out of "fear that premiums would be increased or the policy canceled, in the future" as was noted in *Marker*. *Marker*, 318 Ill. App. 3d at 1141. See *Cincinnati*, 183 Ill. 2d at 326 ("[The] insured may choose to forgo an insurer's assistance for various reasons, such as the insured's fear that premiums would be increased or the policy cancelled in the future."); *Enumclaw*, 191 P.3d at 873 ("Like a driver involved in a minor accident, an insured may choose not to tender in order to avoid a premium increase. The insured may also want to preserve its policy limits for other claims, or simply to safeguard its relationship with its insurer."). The District's tender to the ISDA made future premium increases or cancellation of its policy more likely, rather than less.[2] Of course, the District may well have decided that either risk was acceptable given the compensation it received from Indiana, Hartford, and General Casualty for deactivation of its tender of defense. *Cf. CFM*, 398 Ill. App. 3d at 998. Nor is it accurate to describe this case as one where the District exercised its right "[to] forgo coverage" from the other insurers as the *Marker* court noted for the outcome there. *Marker*, 318 Ill. App. 3d at 1144. While we have declined to address the issue of compensated versus uncompensated deactivation of tender, first noted and then dismissed by the circuit court, we observe that *foregoing* coverage from other insurers generally does not entail receiving $660,000 as the District received from Hartford, Indiana, and General Casualty for its deactivation of tender. Compensated deactivation of tender appears indistinguishable from a payment of "a debt *** equally owed by another insurer." *CFM*, 398 Ill. App. 3d at 998. The District presents us with no good reason to conclude that the targeted tender doctrine, as established by our supreme court's decisions, should extend to the circumstances present in this case.

¶ 44    The ISDA advances a handful of other arguments effectively seeking equitable contribution. It relies on the "transfer of rights" clause of its insurance agreement with the District; it argues the targeted tender doctrine does not apply to it because it is an

---

[2]Indeed, the insurance policy between the District and the ISDA was terminated about three months after the District tendered to the ISDA.

"intergovernmental cooperative"; and it contends the District violated a fiduciary duty and a duty of good faith owed to the ISDA. Further, it argues that the District "has been paid twice for its defense and indemnity costs in the Mold lawsuits–once by [the] ISDA and once by the settling insurers." We decline to address those arguments as well.

¶ 45 Under the circumstances presented in this case, we narrowly draw our holding. In our review of the grant of summary judgment on counts II, III, and IV of the ISDA's amended complaint, we conclude that the District was not entitled to judgment as a matter of law. No supreme court case approves the use of the selective tender rule to *consecutive* insurance policies. Nor do we provide such authority in this case. Accordingly, we conclude the circuit court erred in granting summary judgment to the District based on its purported right to selectively tender the defense of the mold lawsuits to the ISDA as a consecutive insurer. Given our remand, we decline to address the "double payment" arguments urged by the ISDA to support this outcome, though we note that the ISDA is correct that an insured party may not receive a double recovery for the same "harm or injury." *Federal Insurance Co. v. Binney & Smith, Inc.*, 393 Ill. App. 3d 277, 296 (2009) (remanding for further findings where "[f]ailure to account for *** settlement [with one insurer] ha[d] the potential of providing [the insured] with a windfall" in light of additional insurance payments from a second insurer). We remand to the circuit court for further proceedings consistent with this opinion.

¶ 46 Though our reversal of summary judgment in favor of the District renders unavailing the District's request for attorney fees in its "Conclusion" of its brief, even if our decision were otherwise, we would reject the District's request out-of-hand as "a claim of error that is merely listed but not 'argued' [does] not satisfy the requirements of Rule 341." *Vancura v. Katris*, 238 Ill. 2d 352, 373 (2010) (citing Ill. S. Ct. R. 341 (eff. July 1, 2008)).

¶ 47 The District's Cross-Appeal

¶ 48 The District asserts it is entitled to reimbursement from the ISDA for certain invoices from Dr. James Woods that it contends *could* benefit both remediation and litigation. The District contends the circuit court misconstrued the District's burden as to the so-called "dual purpose" invoices. The District contends the circuit court enhanced the District's burden of proof at trial when the court referenced policy language that the ISDA would be responsible only for defense costs "at ISDA's request."

¶ 49 We understand the ISDA to counter that the true issue on cross-appeal is whether the District met its burden before the circuit court to prove the "dual purpose" invoices were predominately litigation expenses rather than remediation expenses, which the bench trial, based on the stipulated facts, was meant to resolve.

¶ 50 The parties dispute the applicable standard of review on the cross-appeal issue. The ISDA accuses the District of failing to identify the applicable standard of review in violation of Illinois Supreme Court Rules 341(h)(3) and 341(i) (eff. July 1, 2008) (both parties "must include a concise statement of the applicable standard of review for each issue"). We note the ISDA's position on the applicable standard is itself unclear as it identifies potentially different applicable standards but fails to state which standard should apply to the issue before us. The District argues that its fundamental claim that the circuit court improperly

enhanced its burden regarding the disputed invoices presents a question of law subject to *de novo* review.

¶ 51    We elect to apply a *de novo* standard of review to the District's initial contention that its burden was unfairly enhanced by the circuit court's interpretation of the CGL contract between the parties. See *1350 Lake Shore Associates v. Healey*, 223 Ill. 2d 607, 614, 627 (2006) (questions of law regarding the burden of proof are reviewed *de novo*). Should we find no fundamental error of law regarding the District's burden, we review the circuit court's findings supporting its judgment, following the bench trial, against the manifest weight of the evidence. *System Development Services, Inc. v. Haarmann*, 389 Ill. App. 3d 561, 570 (2009) ("The standard of review in a bench trial is whether the judgment is against the manifest weight of the evidence." (Internal quotation marks omitted.)).

¶ 52    The District concedes that it bore the general burden of establishing that the disputed invoices were subject to reimbursement under the CGL policy. Our supreme court "has long established that the burden is on the insured to prove that its claim falls within the coverage of an insurance policy." *Addison Insurance Co. v. Fay*, 232 Ill. 2d 446, 453 (2009). The District quotes *Aerojet* for the indisputable proposition, under the context of this case, that "it is the insured that must carry the burden of proof on the existence, amount, and reasonableness and necessity of the site investigation expenses as defense costs, and it must do so by the preponderance of the evidence." *Aerojet*, 948 P.2d at 924; see also *Continental Casualty Co. v. Board of Education*, 489 A.2d 536, 546 (Md. App. 1985) ("The insured has the burden of establishing that a given item of legal service or expense was reasonably related to the defense of [the suit against it.] The [insured] must prove its damages."). The District acknowledges that expenses incurred only for remediation are its sole responsibility.

¶ 53    Paragraph 4 of the supplementary payments subsection in section I of the CGL policy expressly provides: "We will pay, with respect to any claim or 'suit' we defend: *** All reasonable expenses incurred by the Member [the District] *at our request* to assist us in the investigation or defense of the claim or 'suit.' " (Emphasis added.) The circuit court duly noted this language. "When construing the language of an insurance policy, a court's primary objective is to ascertain and give effect to the intentions of the parties as expressed by the words of the policy." *Rich v. Principal Life Insurance Co.*, 226 Ill. 2d 359, 371 (2007). "If the words used in the policy are clear and unambiguous, they must be given their plain, ordinary, and popular meaning." *Id.*

¶ 54    The District argues that the circuit court improperly enhanced its burden when it required the District to demonstrate, pursuant to the policy language, that the defense costs were "at ISDA's request." The District asserts the circuit court "went too far in [the] ISDA's favor." However, the District does not contend this provision was invalid or inapplicable. Rather, the District suggests that requiring it to demonstrate Woods' services were at the ISDA's request effectively allows an insurer to simply "say *** that it is not going to pay for particular services." According to the District, such an unrestrained reading of paragraph 4 of the supplementary payments of the policy gives insufficient consideration to the ISDA's "duty," under the CGL policy, to defend suits against the District. The District contends it should not be required to prove the ISDA "requested" the work of Woods reflected in the disputed invoices when the work underlying the invoices benefitted the investigation or

defense of the suits against the District and the remediation the District sought. The District contends the circuit court erroneously classified certain expenses as remediation expenses when they were in fact litigation defense costs as well, for which the ISDA should share responsibility.

¶ 55    The ISDA contends the District's burden at the stipulated bench trial was the same with or without "*at our request*" language in the policy that the circuit court duly noted. The ISDA points out that had the District not hired the same individual for its remediation work that the ISDA hired as a litigation expert, the dispute between the parties would not have arisen**.** In any event, it remained the District's burden to prove, by preponderance of the evidence, that any so-called "dual purpose" billings weighed in favor of an expense for litigation defense and against an expense for remediation. The ISDA points to the absence of a provision in the CGL policy for equally sharing so-called "dual purpose" expenses. The ISDA contends the District's challenge to the outcome of the trial concerns the circuit court's assessment of the evidence, not some sort of misallocation of the District's burden.

¶ 56    Each of the invoices contested by the District was for work performed subsequent to the District's retention of Woods for its own remediation purposes. Indeed, Woods' testimony was that his litigation work was "winding up" toward the end of April of 2001. The four invoices contested by the District, with the earliest dated June 14, 2001, were billed directly to the District, unlike previous bills, which were billed to defense counsel. The District internally coded all of Woods' invoices it received directly as construction, capital improvement, or operation and maintenance costs.

¶ 57    Woods testified that he considered the June 14, 2001, invoice to be the responsibility of the District. He stated that all of the work invoiced for August 16, 2001, was done pursuant to his contract with the school board. He testified that the October 1, 2001, invoice "was needed for the remediation, but it could be used for the forensic[s]." The final invoice, dated December 31, 2001, contained a single line entry that expressly pertained to a meeting regarding remediation. Woods testified that other line items on this invoice "could have been used for both," but later stated line items were performed for remediation and "were not intended for the lawsuit." Nonetheless, Woods noted that most of the work reflected in the invoices "could" have been used for litigation in addition to remediation.

¶ 58    At the bench trial on the stipulated facts, the circuit court was asked to decide whether the services in the disputed invoices were "incurred by [the District] at [the ISDA's] request to assist [the ISDA] in the investigation or defense of the claim or 'suit,' " under the language of the policy. Whether Woods' services *could* have been used for litigation, and not solely for purposes of remediation, was rendered a factual question, which fell to the circuit court to resolve as trier of fact. The court did precisely that. The circuit court did not rule that absent a directive from the ISDA authorizing Woods' work all of the disputed invoices were the responsibility of the District. Rather, the circuit court properly sifted through each line item in the invoices to determine whether the invoices, which undoubtedly arose at the direction of the District, were predominately for remediation or litigation. The court concluded that the ISDA had to reimburse the District for the April 26, 2001 invoice and the May 16, 2001 invoice, because the line items concerned litigation defense matters, not because there was a showing that the ISDA expressly "requested" the work to be performed.

-14-

As we noted, the ISDA does not challenge these findings on appeal.

¶ 59    We reject the District's contention that the circuit court's reference to the policy language should somehow be understood as enhancing the District's burden at trial. Based on our *de novo* review, the District's burden was never enhanced by the circuit court below. The District's burden before the circuit court was to demonstrate that the disputed invoices predominately concerned litigation work, not remediation work. Based on the circuit court's judgment, the District did not meet its burden below.

¶ 60    We also agree with the ISDA that the District attempts to make more out of the language in paragraph 4 of the supplementary payments of the policy than is supported by the record. The District's novel claim that the circuit court's rejection of the District's "dual purpose" argument is the product of some sort of misunderstanding by the circuit court regarding the District's burden of proof on the issue is not only misguided but unsupported by any case law. Nor does the record support the District's suggestion that Woods was engaged to do "dual purpose" work. As the circuit court expressly found, Woods was "originally retained by [the] ISDA defense counsel, Robert Smyth, but then *separately retained* by [the District] for its own purposes." (Emphasis added.) The District disingenuously attempts to use the timing of the hiring of Woods to bolster its argument that it should not have been required to obtain the ISDA's consent for Woods' "dual purpose" work because the "ISDA had already given its overall approval to Woods' retention." The distinct and separate hiring of Woods by the ISDA and the District amply supports the circuit court's resolution of the disputed invoices in the ISDA's favor. Clearly, the ISDA did not approve all of the work performed by Woods. The circuit court properly rejected the District's facile claim that the hiring of Woods by the ISDA triggered a duty to reimburse the District for the invoices that arose, following its hiring of Woods, for his efforts at remediation.

¶ 61    The cases cited by the District do not support a result contrary to one reached by the circuit court. "[I]t is the insured that must carry the burden of proof on the existence, amount, and reasonableness and necessity of the site investigation expenses as defense costs, and it must do so by the preponderance of the evidence." *Aerojet*, 948 P.2d at 924. Whether expenses are remedial or defense-related "will depend upon the facts." *Continental Casualty*, 489 A.2d at 544. Nor does the language in another California case cited by the District help its cause. " '*If* site investigation expenses must be incurred by the insurer in fulfilling its duty to defend the insured, they must be incurred. *** Even if the insured may happen to derive some added benefit, the insurer does not shoulder any added burden. The insurer may not be heard to complain.' " (Emphasis added.) *Barratt American, Inc. v. Transcontinental Insurance Co.*, 125 Cal. Rptr. 852, 859 (Cal. App. 2002) (quoting *Aerojet*, 948 P.2d at 925). As always, "if" conveys far more than its two letters suggest. It is undoubtedly true that the insurer will not be heard to complain when the insured proves "site investigation expenses" had to be incurred to fulfill the insurer's duty to defend the insured. In the instant case, the inescapable conclusion is the District failed to meet that burden. The other cases the District cites, *General Accident Insurance Co. of America v. State of New Jersey, Department of Environmental Protection*, 672 A.2d 1154 (N.J. 1996), *American Bumper & Manufacturing Co. v. Hartford Fire Insurance Co.*, 550 N.W.2d 475 (Mich. 1996), and *State v. Blank*, 745 F. Supp. 841 (N.D. N.Y. 1990), are equally inapposite. Those cases involved governmentally

mandated investigations that were necessary for the defense in the litigation, unlike Woods' work in the invoices before us.

¶ 62 We are given no reason to disturb the findings of the court below that the contested expenses were incurred pursuant to Woods' engagement by the District and not at the ISDA's request, as the policy requires for reimbursement. The District failed to meet its burden before this court to demonstrate that the circuit court's findings were contrary to the manifest weight of the evidence presented. *Haarmann*, 389 Ill. App. 3d at 570. The circuit court's findings do not reflect some sort of enhanced burden imposed on the District based on the policy language; rather, the findings were in line with the evidence that each of the disputed invoices was the sole responsibility of the District, which arose from its remediation efforts. We also agree with the circuit court's observation that nothing in the CGL policy provides support for the District's proposition that remediation invoices should be split evenly between the insurer and insured when the underlying work "could" have aided the litigation.

¶ 63 Upon our review of the record, the circuit court's conclusions regarding each of the disputed invoices were not contrary to the manifest weight of the evidence. Rather, the record evidence supports that the work reflected in the disputed invoices was not requested by the ISDA or required to fulfill the ISDA's duty to defend the District.

¶ 64                                   CONCLUSION

¶ 65 We decline the District's invitation to extend the targeted tender rule beyond cases involving concurrent insurance policies, as the only context in which our supreme court has applied the rule. Because the District's insurance policies were all consecutive, the selective tender rule did not apply to compel the ISDA to defend alone, without the prospect of equitable contribution from other insurers, the mold lawsuits against the District. We reverse the summary judgment granted to the District on counts II, III, and IV of the ISDA's amended complaint. We reject the District's cross-appeal that the circuit court erred in its judgment that certain invoices from the mold expert, retained separately by the ISDA and the District, were for litigation purposes and therefore subject to reimbursement under the CGL policy. We affirm the judgment in favor of the ISDA following the stipulated bench trial. We remand for further proceedings consistent with this opinion.

¶ 66 Reversed in part and affirmed in part; cause remanded.